**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VICTOR APOLLO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 18 C 6475** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **OFFICER ADAM STASINOPOULOS,** | ) | |
| **OFFICER DANIEL MILLER, and** | ) | |
| **OFFICER LAUREN TREVARTHEN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

A deposition, even at its best, is not a garden party. Sadly, "[t]he transcripts of depositions are often very ugly documents." *DF Activities Corp. v. Brown*, 851 F.2d 920, 923 (7th Cir. 1988)(Posner, J.). Indeed, the problem of lack of civility and professional misconduct during depositions is a matter of considerable concern to courts around the nation. As one judge put it: "In over nearly 30 years of lawyering and judging the undersigned has witnessed few episodes which approach this case in vitriolic animus." *Ross v. Kansas City Power & Light Co.*, 197 F.R.D. 646, 664 (W.D.Mo. 2000). Unfortunately, the problem is not new. *See, e.g.,* Eric B. Miller, *Lawyers Gone Wild: Are Depositions Still a "Civil" Procedure*, 42 Conn.L.Rev. 1527 (2010); A. Darby Dickerson, *The Law and Ethics of Civil Depositions*, 57 Md.L.Rev. 273 (1998); Jean M. Cary, *Rambo Depositions: Controlling an Ethical Cancer in Civil Litigation*, 25 Hofstra L.Rev. 561 (1996); Ben Aisenberg, *Countering Deposition Abuse*, 21 Colo.Law 1889 (1992).

Ironically, misconduct at depositions – whether by counsel or the deponent, himself – is a

byproduct of the expansion of the Federal Rules of Civil Procedure and the discovery mechanisms designed to minimize surprise at trial and put an end to the common law's preference for "trial by ambush."[1] Unfortunately, these expansive rules are often exploited for improper purposes. The misconduct in depositions occurs precisely because they are conducted outside the presence of a judge, and thus provide a fertile opportunity for all too frequent misbehavior by counsel and witnesses alike. *Donelson v. Hardy*, 931 F.3d 565, 567-69 (7th Cir. 2019). Judges, of course, have the ultimate responsibility in overseeing the discovery process to ensure that depositions are conducted appropriately, *Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 (7th Cir. 2012); *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 902 (7th Cir. 1981), and take appropriate remedial action when they are not. Accordingly, where there has been claimed misconduct during a deposition, it is ultimately the responsibility of the court to determine what is to be done.

The instant case, happily, does not involve the brutish, nasty, rude, snide behavior between lawyers that all too often exists in cases in which deposition misconduct is claimed as a basis for reopening a deposition. Still, the defendants contend that their deposition of the plaintiff was sufficiently obstructed that it should be reopened, and the defendants' lawyer permitted to continue with her examination. For how long, the defendants do not say. The objection by the defense centers not so much on the conduct of plaintiff's counsel, but rather on the claimed misconduct of the plaintiff, himself. It is contended that his evasive and obstructive behavior mandates that defendants

---

[1] The concept of trial by ambush has long ago fallen into desuetude in both state and federal courts. Modern discovery practices seek to facilitate open and even-handed development of the relevant facts so that cases may be decided on their merits. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002); *Schlagenhaus v. Holder*, 379 U.S. 104, 114-15 (1964); *Miller v. Lenz*, 2010 WL 252287, 6-7 (N.D.Ill. 2010). *See generally* Rule 1, Federal Rules of Civil Procedure.

and their counsel be given an *unspecified* amount of additional time to continue the deposition of plaintiff, beyond the seven hours they have already had. [Dkt. #120]. The plaintiff, not surprisingly, objects to the defendants' open-ended insistence that more time be accorded than that provided by Rule 30(d)(1) of the Federal Rules of Civil Procedure. The answer to this question requires a review of the deposition transcript.

## ARGUMENT

### A.

Rule 30(d)(1) limits the length of depositions to one day of seven hours. Fed. R. Civ. P. 30(d)(1). The Rule also requires the court to "allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination." Additional time is not available for the asking. A party seeking additional time must show "good cause." *Mother & Father v. Cassidy*, 338 F.3d 704, 711 (7th Cir. 2003). As with other discovery matters, the court has broad discretion to determine whether circumstances warrant additional deposition time. *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). In making that determination, courts may consider, for example, whether "the examination will cover events occurring over a long period of time," "the witness will be questioned about numerous or lengthy documents," or expert witnesses will be involved. Fed. R. Civ. P. 30(d)(1), Advisory Committee's Note (2000). *See also United States §. & Exch. Comm'n v. Kandalepas*, 2018 WL 4005201, at *2 (N.D. Ill. 2018)*; Indianapolis Airport Authority. v. Travelers Prop. Cas. Co. of Am.*, 2015 WL 4458903, at *1-2 (S.D. Ind. 2015).

Other factors, more pertinent to the current dispute, might include whether the desired information could have been gathered in the first seven hours of the deposition, *see Kandalepas*,

3

*supra; Rahman v. Smith & Wollensky Rest. Grp., Inc.*, 2009 WL 72441, at *4 (S.D.N.Y. 2009);

*Arista Records LLC v. Lime Grp. LLC*, 2008 WL 1752254, at *1 (S.D.N.Y. 2008), or whether

"obstructionist tactics" were used, such as constant bickering or lengthy sparring between counsel.

*Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc*., 2007 WL 4557820, at *2 (N.D. Ill. 2007). *See also*

*In re: Jimmy John's Overtime Litigation*, 2016 WL 4445769, at *1 (N.D. Ill. 2016).

The defendants refer to a number of places in the deposition where they claim plaintiff was

uncooperative or obstructionist, and a handful where plaintiff's counsel made objections. But they

ask for no specific time to extend the deposition, apparently feeling the court should sift through the

entire deposition and see where time was wasted, tally it up, and give defendants another go at it.

Unfortunately, the defendants are not specific about what topics they would address if they were

granted additional time, nor do they ever specify how much time is needed and should be awarded.

Judges are not to do the work of lawyers, *Kay v. Board of Ed.*, 547 F.3d 736, 738 (7th Cir. 2008);

*WWC Holding Co., Inc. v. Sopkin*, 488 F.3d 1262, 1279-80 (10th Cir 2007)(Gorsuch, J., dissenting),

and we may not do so here. Clearly, even if the defendants made the required showing of "good

cause," that would not mean they would be granted *carte blanche.* But, for all practical purposes, that

is what their open-ended Motion seeks. Based on a careful reading of what occurred at the deposition

and even though the plaintiff, himself, was somewhat argumentative at times – hardly a rare

occurrence in today's climate – I do not think that granting the defense Motion is required or would

be appropriate.

After careful examination of the proceedings, it is fair to conclude that although the

deposition did not go as smoothly as defense counsel might have liked – it seldom does – there was

not the acrimony and nastiness and intentional subversion that appears all too often in deposition

transcripts. Not surprisingly, many cases have denied motions for additional time to conduct a deposition because the questioner often asked the "wrong" questions, thus using up limited time that might have been better spent on the topics counsel claims they did not have the opportunity to sufficiently address. *See, e.g., McNeil v. New York State Off. of Alcoholism & Substance Abuse Servs.*, 2019 WL 2647572, at *2 (E.D.N.Y. 2019)(". . . numerous pages of the transcript reflected that much time was wasted on questions that might better have been spent on the topics defendants now argue were not sufficiently addressed."). The seven-hour limit imposed by Rule 30(d)(1) encourages efficiency in depositions. While parties may wish to cover a wide breadth of topics in a given deposition, they are necessarily required to prioritize their questions in order to remain within the time limits set by the Federal Rules. *See* Fed. R. Civ. P. 30(d)(1). In short, that defendants wish to develop further areas of inquiry – or explore in greater depth those that were touched upon – is not "good cause" to reopen a deposition. *Scott v. Multicare Health Sys.*, 2019 WL 1505880, at *2 (W.D. Wash. 2019).

While one can quarrel with certain of the questions asked by counsel for the defendants, it is difficult to deny that the plaintiff was often resistant – or at least exceedingly cautious in his answers – if not openly hostile – but no more than occurs routinely in many depositions. A few examples of what went on will provide a better sense of the proceedings than is perhaps provided in the Motion.  The first thing the defendants complain about is that, rather than state his name and stipulate to the deposition and oath administration proceeding remotely, plaintiff's counsel only stated his name.  He was then asked again to stipulate, which he did adding that he didn't know a lawyer who wouldn't do so. [Dkt. #120-3, Apollo Deposition., at 6-7].  That was it.  That was perhaps a few seconds that were "wasted." But, "*de minimis non-curat lex*" applies in the context

5

of a deposition as it does in other settings throughout the law.

Actually, the first significant delay came right after that, and it was the result of defense counsel not checking into the facilities available for the remote deposition at the prison. Rather than send copies of necessary documents to the prison for the plaintiff to reference, she expected (or at least required) him to read them as she held them up to her computer camera. That error was compounded by the fact that the prison had only an iPhone available, and there was no way anyone could read complicated documents on the small screen. That made for a delay of about an hour, and for additional brief delays thereafter when defense counsel wanted plaintiff to go over other documents and photos of the injuries he allegedly suffered during his arrest over the tiny phone screen. [Apollo Deposition., at 12-17, 224-26, 248-58].

The first objection from plaintiff's counsel came shortly thereafter when defense counsel asked what plaintiff took Depakote for. [Apollo Deposition., at 21]. Plaintiff's counsel eventually told defense counsel that they were not raising mental health damages in the case [Apollo Deposition., at 24-25], and that they would not answer any questions about drug use other than on February 15 and 16, 2018. [Apollo Deposition., at 26]. However, unless the refusal was based upon the Fifth Amendment, it was improper not to answer the questions. Drug use, whether lawful or not, is an appropriate subject for inquiry to test and determine the ability to have observed and to have recalled that which is the subject of testimony. Memory, after all, is fallible, *Specht v. Google, Inc.*, 747 F.3d 929, 933 (7th Cir. 2014); *Lynch, Inc. v. SamataMason, Inc.,* 279 F.3d 487, 490-91 (7th Cir. 2002), and thus, inquiry into a condition that could affect the ability to register and recall events is a proper subject of inquiry, *United States v. Owens*, 484 U.S. 554 (1988), and includes the taking of prescription drugs. *United States v. Robinson*, 583 F.3d 1265, 1272-73 (10th Cir. 2009). And so,

6

while questions relating to Depakote were perfectly proper, defense counsel precipitated a misstep that needlessly caused additional delay.

Prior to the deposition, I had entered four separate Orders, advising counsel of what to do in the event issues arose "during a deposition":

> Counsel should contact the Court should any difficulties arise *during depositions*. I can be reached by a call to my courtroom deputy, Yulonda Thomas, at *312-408-5178*.

[Dkt. ##97, 102, 107, 108](emphasis supplied). The Orders could not have been clearer. Defense counsel admits – in a footnote – that when she decided to contact me about the deposition, she did not call the number in the Orders. [Dkt. #120, at 5 n. 3]. Why, she does not say. In fact, she did not even call the correct area code for Chicago – the very place where the courthouse is located. She called area code 408, which is in California. But she still mysteriously claims she called chambers. She did not. As the deposition transcript makes clear, she called a number in the San Jose, California area code, (408) 418-9388. [Apollo Deposition., at 23]. Where that number came from is a mystery. The area code, itself, should have alerted her that it was not my chambers number in Chicago – or any area code in northern Illinois, for that matter. In fact, the number was apparently for some Zoom meeting, because counsel was asked for an access code – which also should have alerted her that it was not chambers or chambers voice mail. Nonetheless, she insisted on proceeding and left a message on whatever line she had stumbled upon. [Apollo Deposition., at 23-24]. That all added up to perhaps another fifteen minutes wasted. Worse, her mistake eliminated any possibility of immediate judicial resolution of that or subsequent issues. Yet, this is the kind of thing that dominates defendants' attention in their motion.

All this was due to defense counsel's lapses, although at the deposition she sought to lay the blame on the court and its staff. [Apollo Deposition., at 324 ("And my efforts to call Judge Cole in order to resolve the matter today were -- I was unable to resolve them because I left a message with the court and received no response. So there was an effort to try to resolve this issue today.")].[2] Apart from the error of this claim, counsel was not stuck at the prison without resources. She was at her office (or perhaps working from home) with a computer and a cellphone. One assumes she had a case file that ought to have had at least one of the numerous Orders I entered instructing parties to call – not a Zoom meeting number in San Jose, California – but a Chicago number – 312-408-5178. Counsel ought to have checked her file immediately when she saw she was dialing a Zoom number that required an access code. Or, if she did not have a file, she could have easily accessed the docket and the handful of Orders online with one of her devices – and realized her mistake – although it should have been immediately apparent to her. It was, to be frank, unacceptable not to have done so, and it significantly undermines her insistence that (some unspecified amount of) additional time should be given to depose plaintiff.

When they went back on the record, the attorneys seemed to agree that drug use questions would be confined to February 15 and 16. [Apollo Deposition., at 26 (Defense Counsel: "All right . . . That's fine. I understand.")]. Defense counsel then threatened to suspend the deposition and come back for another session. [Apollo Deposition., at 27]. Plaintiff became upset and wanted to know what that meant. [Apollo Deposition., at 27]. Defense counsel then asked, again, what medication Plaintiff had taken that day and plaintiff responded, for the third time, Depakote. [Apollo Deposition., at 28]. He then improperly and provocatively asked counsel what medication she had

---

[2] As the previous discussion shows, this statement was incorrect.

8

taken.  [Apollo Deposition., at 28]. The plaintiff wisely and justifiably has not tried to defend this exchange.

Defense counsel threatened to suspend the deposition about a half dozen times after that. [Apollo Dep., at 15, 27, 273, 278, 324].  Plaintiff, understandably, then interrupted things on his own, demanding to know what she meant and whether he would have to go through another day of questioning and squinting at documents over a cellphone.  But, importantly for our purposes, defense counsel never did suspend the proceedings, although she was clearly aware of the proper remedy for what she now claims was happening to her. Under Rule 30(d)(3), "a party may move to terminate . . .[a deposition] on the ground that it is being conducted in bad faith . . . ." *See* Fed.R.Civ.P. 30(d)(3)(B); *Verser v. Barfield*, 641 F. App'x 583, 585 (7th Cir. 2016)(if a party who feels there are abusive tactics being used in a deposition, the "remedy is to move that the deposition be stopped or limited . . . ."); *Bierk v. Tango Mobile, LLC*, 2021 WL 698479, at *2 (N.D. Ill. 2021).

Here, the aggrieved lawyer did not call chambers despite multiple instructions in my four prior written Orders. That should be combined with her failure to realize that a 408 number is not for the area code of the courthouse in Chicago, realize a Zoom meeting number is not and could not be my chambers, and other circumstances counsel against allowing some unspecified amount of additional time to depose the plaintiff. *See Bierk*, 2021 WL 698479, at *2. Judge Gettleman referred this case to me for "discovery supervision," not for permitting discovery to favor one side or another. If parties choose not to avail themselves of the remedies provided in the federal rules or read my Orders – multiple Orders – or take advantage of how I could be reached to address deposition issues, the responsibility cannot be shifted away from the responsible party, who then demands some

unspecified additional time to continue to depose the opposite party.[3]

## B.

A critical question, given the Motion, is whether the plaintiff is responsible, in part, for wasted time, and, if so, how much time did the plaintiff supposedly cause to be wasted or needlessly expended? Unfortunately, the defendants don't say. We know from the transcript that a fair amount of time was wasted by the defendants – while not intentionally, certainly avoidably. We know that plaintiff had to answer the question about what medication he took that morning. Once was certainly appropriate. Three times was not, although the plaintiff is not without fault in the matter. [Apollo Dep., at 20]. We know that plaintiff offered to and did eat an exceedingly brief five-minute lunch of peas and applesauce. [Apollo Dep., at 56-57]. And it must be said that some of defense counsel's questioning was collateral to the case. While questions dealing with memory are unquestionably appropriate, the inquiry here is the extent of the questions on a given topic and how they were asked. There comes a point when meaningful and incisive questioning ceases to have appropriate ends and becomes an unnecessary and inappropriate expenditure of time. And while a questioner may depose a subject regarding facts that are objectively appropriate, there is a price to be paid for the amount of time spent on any given topic and for the topic selected. All things must have an ending point – especially in depositions. If one does not budget necessarily limited time, there will simply not be enough time to get to the heart of what is truly significant. As the old saying goes, "you pays your money and you takes your choice." But choices have consequences. *United States v. Martinez-Salazar,* 528 U.S. 304, 307 (2000); *Croe ex rel croe v. Ziegler Co.*, 646 F.3d 435, 444 (7th Cir.

---

[3] Oddly, despite my contact information appearing in four prior Orders, plaintiff's counsel did nothing to correct the defense lawyer calling a 408 area code rather than the 312 area code and chambers number which had appeared in four prior Orders.

2011).

## C.

While the examples of what unfortunately occurred at the plaintiff's deposition are many, we limit our discussion to those we think significant to consideration of the Motion. For instance, defense counsel spent some time attempting to catalog plaintiff's tattoos:

Q. What's the meaning of your tattoo, M-O-B?

A. Who?

Q. What is the meaning of your tattoo, M-O-B?

A. I don't know what you talking about. What'd you say? What's the meaning of it?

Q. Yes.

A. What does it say? What does it spell?

Q. Sir, this is not the opportunity for you to ask me questions; it's for me to ask you questions. And if you want to continue to obstruct the deposition by doing that, we will just continue going on all day today. And I'm going to ask the judge to continue the deposition and we'll just come back another day. So you are perpetuating it by asking me questions –

A. This --

Q. -- and obstructing the testimony.

A. -- it -- it has nothing. You trying to --

Q. Mr. Apollo, do you have -- Mr. Apollo, do  you have -- do you have a tattoo that says M-O-B on  your arm?

A. Yeah.

11

Q. What's the meaning?

A. It ain't got no meaning.

Q. When did you get it?

A. There is no meaning.

Q. When did you get it?

A. When I was young.

Q. How old?

A. I don't remember. I was -- I was real young.

Q. What about the $2 bill? You have a $2 bill tattoo, too, don't you?

A. Well, that thing was when I was -- when I was a teenager.

Q. What's the $2 bill for?

A. I -- every -- every -- it's self-explanatory. It's just what it is.

Q. It's -- I'm asking you. If it's self-explanatory, then tell me what it means.

A. It ain't got no -- it ain't got no meaning to it. It's a $2 bill.

Q. Okay. M-O-B doesn't stand for money over bitches?

A. Maybe to you.

Q. What about you?

A. Huh?

Q. What about you?

A. No, it ain't got no meaning, Gail.

Q. All right. You also have a tattoo on your chest; right?

A. You already know.

12

Q.  Yes or no?

A.  Yes.

Q.  What does it say?

A.  You tell me.

Q.  Mr. Apollo, if you continue to obstruct my ability to ask you questions in this deposition –

A.  Listen -- listen, Gail, you just -- you told me the rest of them, you might as well tell me that  one, too. They all –

Q.  Mr. -- Mr. Apollo, you're obstructing my  ability to take your deposition. If you don't want  to -- if you don't want to be compliant and give the  testimony properly, then we'll just keep carrying on   and your deposition will continue indefinitely.  I mean, we'll just come back another day until you keep   asking question -- until you answer my questions.

A.  Gail, what is it -- what does all this have to do with excessive force? Nothing. Nothing.

Q.  Mr. Apollo, this is not your opportunity to ask me questions.

A.  You ask if I have tattoos and stuff, I mean, what do you want to know? I got six toes on my left  foot. What does that have to do with excessive force?

Q.  Mr. Apollo, I have the authority to ask you these questions because you filed a lawsuit. I'm not arguing with you. Answer the question. What does the tattoo on your chest say?

A.  You tell me. You've been telling me the rest of them.

Q.  Mr. Apollo, answer the question. What does the tattoo on your chest say?

A.  It says insanity. What's your --

Q.  What does that -- why do you have a tattoo of insanity on your chest?

A.  All these from when I was young. When I was  young. You know like when you were young, you used to do things that you just was doing. Remember when you were a teenager? Remember a lot of dumb things that  you did?

13

Q.  Were you ever in a gang?

A.  No.

Q.  Were you ever a Vice Lord?

A.  No. I was -- I was accused of it, but never was.

[Apollo Dep., at 36-39].

From there the questioning turned to plaintiff's address, his mother, his brother, his wife, his children, where he was married, how old his children were, his education, and continued on in that vein for while.  [Apollo Dep., at 36-46].  Plaintiff answered counsel, multiple times, that he lived at the same address for 38 years. This was after counsel asked him multiple times what people called him, what his date of birth was *and* how old he was, social security number, drivers license number, address, how long he lived there, if he stayed anywhere else, etc. [Apollo Dep., at 31-33].

Next, the topic was the day before plaintiff's arrest:

Q.  Do you recall February 14th of '18?

A.  February what?

Q.  14th of 2018.

A.  February 14th?

Q.  Yes.

A.  Yeah.

Q.  Tell me what you remember about February 14th of 2018.

MR. SINSON: Well, I'm just going to object.  That's too general of a question. I mean, none of the  charges that were brought were brought after February 14th. And one, telling what -- asking what  happened generally I don't think is helpful to anything on what happened in this case; so . . .

14

MS. REICH: I mean, if you want to say it's not a proper objection, then say it's not a proper  objection. But you're not entitled to make a speaking objection to coach your client.

MR. SINSON: What could be the possible relevance? I'm objecting.

MS. REICH: Okay.

Q.  (By Ms. Reich) Tell me what you did on18  February 14, 2018.

A.  What did you say?

Q.  Tell me what you did on February 14th of 2018.

A.  That wasn't the day I got arrested.

MR. SINSON: No. You got arrested on the 15th.

A.  Right.

Q.  (By Ms. Reich) Tell me what you did on February 14th of 2018.

A.  Of 2018?

Q.  2018.

A.  You said 2018?

Q.  Yes.

A.  Huh?

Q.  Yes.

A.  February 14th?

Q.  Yes. Valentine's.

A.  What'd you do on Valentine's Day? What did you do? Eat? Watch a movie? Were you with your husband?

Q.  Mr. Apollo, are you going to answer my questions or are you going to obstruct -- continue to  obstruct the deposition?

A.  Huh?

Q.  Are you going to answer my questions or are you going to continue to obstruct the deposition?

A.  The 14th, I was -- oh, that was the day before. I -- I had something to eat. And that's about it.

[Apollo Dep., at 66-68].

As we have seen, the plaintiff often was not a model of compliance and cooperativeness. Also, there were the type of audio problems we are all becoming too familiar with as our challenging circumstances move into a second year.  But, by the same token, perhaps the tattoo encyclopedia and the menu for Valentine's Day three years ago were not all that meaningful in testing the plaintiff's recall or even advanced meaningful inquiry very far.  And, as we have discussed, while questions relating to memory can be significant, *see supra* at 6; *Jared v. Gonzales*, 461 F.3d 867, 870 (7th Cir. 2000); *Tellabs Operations, Inc. v. Fujitsu Ltd.*, 2012 WL 3731497, 13 (N.D.Ill. 2012), they have their limits, and efficacy depends on careful selection of questions. At the same time, it is difficult to say that the plaintiff's reactions and his way of dealing with certain of the questions were entirely appropriate. They were not. But that alone is not outcome-determinative. The conclusion one is left with is that while defense counsel was free to propose the questions she chose, she could not do so with the expectation that she would simply get more time on another day to ask more meaningful and pointed questions. The rub is to arrive at a conclusion that will reasonably accommodate the legitimate interests and conduct of defense counsel, while at the same time take into account the conduct of the plaintiff.

Thereafter, defense counsel wound her way to the day of plaintiff's arrest:

Q.  Okay. What's the first thing you remember about February 15, 2018

16

A. The first thing I remember?

Q. Yeah.

A. When I woke up?

Q. Uh-huh.

A. I woke up.

Q. Okay. What did you do that day?

A. I went to -- went to see some friends. I was hanging out. I was having a pretty good day.

Q. Do you remember what you had for breakfast?

A. I was trying to enjoy the day and try to have a little -- have a little fun.

Q. Do you remember what you had for breakfast?

A. For break -- I don't know. Some oatmeal.

Q. Do you remember what you had for lunch?

A. For lunch? I think some McDonald's.

Q. So you said you went to have some fun with some friends. Where were you?

A. Hey, on February 15th, you remember what you had for lunch?

Q. Where were you?

A. Do you remember what you had for lunch the day before yesterday?

Q. Mr. Apollo, let me ask you a question.

A. All right, Gail, go ahead.

Q. Yeah. I want to ask you -- I want to ask you a question. Is there something that you have not understood about the instructions, that you were not to ask me questions? Do you not understand that?

A.  I hear you.

Q.  Do you not understand that?

A.  But I'm trying to get you to understand how silly the questions are.

Q.  But, Mr. Apollo, it doesn't matter how silly you think the questions are. And if you continue to  obstruct -- since you've been obstructing this deposition the entire time, we're just going to keep  going. I mean, all you're doing is prolonging it.

A.  No, I'm not. You ain't asking the questions.

Q.  And, frankly, you're making yourself look silly.

A.  You telling this long story. Ask --

MR. SINSON: So –

A.  -- ask the question.

*      *      *

Well, if your -- if your client would simply just answer the questions, it would go a lot faster. You know he's obstructing this deposition.

THE WITNESS: I'm obstructing?

MR. SINSON: Ask your question.

MS. REICH: I sure am trying.

THE WITNESS: I mean, Gail, look at what you -- you asking what I had for breakfast three years  ago.

[Apollo Dep., at 85-88].

The plaintiff's insistence on asking the defendants' lawyer questions, calling her by her first name, and speaking to her in the fashion he did was grossly improper. Her restraint was admirable. But when this type of conduct is considered in the context of the entire deposition, it simply does not warrant that the deposition be reopened to allow counsel to ask further questions – especially when

18

the supposed additional time required is never specified, and the subject matter that would be explored is not reified.[4]

**D.**

The reality in this case is that whatever quibble one may have with defense counsel's selection of questions, the matter she sought to explore was valid. Equally undeniable is the fact that there was some resistance, annoyance, and misbehavior on plaintiff's part. Although not much. Perhaps a jury brought in during what may still be a pandemic, at risk to their health, may not be impressed that plaintiff cannot remember his McDonald's order from 2018, but claimed to have vivid recollections of what occurred in this case. Similarly, testing a witness's memory by asking questions about breakfast three years ago might not commend itself as a winning or even viable technique of testing memory. Nonetheless, the plaintiff's behavior at the deposition was, in certain respects, improper and ill-advised, and if repeated at trial, would go far towards a jury's rejection of his central thesis in the case.

Much the same type of interaction continued on into the late afternoon. For example, near the close of the deposition, defendants' counsel turned to a series of questions that seemed to focus on plaintiff's memory of who was in the car with him on the day of his arrest. While the inquiry was unquestionably appropriate, the plaintiff was at times uncooperative and evasive:

Q. All right. Would you -- how would you describe your relationship to Nisa Robinson?

A. We're pretty good friends, like, you know . . .

---

[4] While the plaintiff's lawyer was certainly put in a bind by all of this, decorum would have been better served if plaintiff's counsel would have at least indicated to his client that his interest would have been better served by acting in a more decorous and less familiar way.

Q.  Okay. Did you ever at any time believe that she was not the person in the car but it was somebody else?

A.  That it was somebody else?

Q.  Did you ever have the belief that she was not the person in the car with you that day but it was  somebody else?

A.  What do you mean it was somebody? What are you saying it was somebody?

Q.  I'm asking you if you ever believed -- did you always know it was Nisa Robinson in the back of that car that day? Or did –

A.  Yeah. She was in there.

Q.  Yeah. Or did you ever think it was somebody else?

A.  Who would it be? You?

Q.  Yes or no, did you ever think it was somebody else?

A.  I mean, no. It was Nisa.

Q.  Okay.

A.  Who else would it be?

Q.  Mr. Apollo, please just answer the question.  Did you ever think it was anybody else?

A.  I don't understand where you going with this. Well, I -- I just told you it was Nisa.

Q.  Okay. The two people in the car were Russell Moses and Nisa Robinson; right?

A.  And me, it's three.

Q.  And you, okay. The two other people were Nisa Robinson and Russell Moses?

A.  Right.

Q.  Did you ever think it was somebody else and not Russell Moses and not Nisa Robinson?

A. No. Were you in there with us, too?

Q. Is that a no? Is that a no?

A. It's three people.

Q. Is that a no?

A. Three people.

Q. Is that a no? Is that a no?

A. No.

Q. Thank you.

A. Right. It's all -- three people was in the car.

[Apollo Dep., at 317-19].

As the deposition came to a close, defense counsel chided the plaintiff about putting a mask over his mouth (as he sat in a prison room) – "at opportune times." [Apollo Deposition., at 342]. Whether what was done in this regard was because of the Covid epidemic or had some ulterior or sinister purpose is the question. In any event, this is hardly even a partial justification for the defendant's motion. Depositions, even the best of them, are not tranquil, overly polite affairs where the invitees are on their best dignified behavior. They are real world, adversarial affairs with outcomes that can profoundly affect important interests. The example just given above occupied no meaningful amount of time, and standing alone has no effect on the appropriate analysis that should guide decision in this case.

One specific complaint of defendants regards questioning of plaintiff about missing dash-cam video that plaintiff contends captured his arrest, but was improperly destroyed by the Village. The defendants' motion claims that obstruction from the plaintiff and objections from his lawyer

prevented proper questioning on this significant topic. Defendants claim they wanted to know how plaintiff learned about the videos being destroyed and thus asked:

> Q. How do you feel your public defender did in working on your cases?
>
> A. I don't know. I mean, she -- she -- I -- she say she -- she did the best she could. She couldn't find -- she couldn't find no witnesses. And she said the videotapes, she couldn't get no videotapes except for the one -- the one that was at the -- in the station. And so, I mean, she -- she said she did the best she -- said she did the best she could to try to get me -- try to get me some help on the case. But she couldn't -- she couldn't find no other videos. And I told her there's got to be other videos. There's got to be other videos.
>
> Q. And what other videos did you think there were?
>
> A. Well, look, you got to have either -- in Illinois there's dash cam or the body cam or both, which they should have. The officers, should be Miller and whatchamacallit -- and Stasinopoulos and  whoever else was there. The video inside the cell.  Just what you talking about, if I have some type of meeting or whatever, there should be a video of that. There should be a video inside -- there should be a video in an ambulance. There should be video in the hospital. I mean, everywhere -- everywhere I went,  I'd imagine there should be some type of -- some type of video for it. And she told me -- she told me there should be, but she couldn't either -- I guess they weren't giving it to her.

[Apollo Dep., at 219-20].

In essence, plaintiff's answer was that he assumed there were videos, and they were either withheld or missing.  But the questioning continued, this time with an improper and purposeful interruption from plaintiff's counsel with an attorney-client privilege objection which, in turn, led to extended sparring between counsel:

> Q. Do you have the belief that video of your arrest was captured on -- that existed? Excuse me.
>
> A. Yeah, because, you know --
>
> MR. SINSON: Well, wait, wait. So corporate representatives from Forest Park Police Department  testified that there was video from the scene of his arrest that existed

and that they destroyed it, okay? And, you know, whatever he knows about that is based on conversation with me and, you know; so –[5]

MS. REICH: Why are you testifying about it? I mean, now you're telling him anyway; so -- but, I mean, if you're reporting what was testified –

MR. SINSON: I'm instructing him -- I'm instructing him not to answer a question that invades the attorney-client privilege. And I'm questioning you for why you are asking him a question that you know -- you know, based on the testimony that's already occurred in this case, the only way he would know that is through -- through me; right?

MS. REICH: Well, I mean, now you're just – now you're just feeding your own client testimony.

MR. SINSON: Have you seen a police report in this case that disclosed that Officer Stasinopoulos' dash cam was working at the time and that that video was absolute –

MS. REICH: You know what --

MR. SINSON: -- fact --

MS. REICH: -- this is not a time to get into an argument with me about this, Kent.

MR. SINSON: -- I am --

MS. REICH: If you want to take that -- if you want to take that up at some other time, that's fine. That's not for this videotaped deposition –

MR. SINSON: Where's the rulebook that says that --

MS. REICH: That's not -- that's not -- if you want to take issue about what evidence exists and why or why not and what have you, this is not the time. Don't waste my time that you're complaining about that's wasted in this deposition arguing about things that can't be resolved here. So –

MR. SINSON: You asked him -

---

[5] One could not know in advance whether what was claimed in this assertion by counsel was accurate. Plaintiff's view of what happened to the tapes was not necessarily based on privileged conversations with his lawyer. The basis for his claim could have come from his own supposed knowledge as a participant in his own arrest or could have come from someone else other than his lawyer. Hence the questions by the defense counsel.

MS. REICH: -- all I'm trying to do is get testimony from your client.

MR. SINSON: -- an answer that violates the attorney-client privilege.

MS. REICH: Fine

[Apollo Dep., at 221-23].

While counsel is allowed to object – and a witness may refuse to answer – on the basis of a claim of privilege, Fed.R.Civ.P. 30(c)(2); *see, e.g., Redwood v. Dodson*, 476 F.3d 462, 468 (7th Cir. 2007); *Jokich v. Rush Univ. Med. Ctr.*, 2020 WL 2098060, at *2 (N.D. Ill. 2020); *LM Ins. Corp. v. ACEO, Inc.*, 275 F.R.D. 490, 491 (N.D. Ill. 2011), no claim of privilege was justified here – at least not one that would have prevented the witness from explaining whether his information came from someone other than his own lawyer. In any event, it was not the kind of interchange that occupied very much time – certainly not enough to require or justify the resumption of the deposition, either considered alone or in conjunction with the other incidents of the deposition about which the defense has complained.

Defense counsel's questioning moved to an odd topic regarding what plaintiff might know about other cases in which there were missing videotapes:

Q. Are you aware of any instances where there was a failure to activate the dash cam in a -- in a squad car when required to do so?

MR. SINSON: Other than this case?

Q. (By Ms. Reich) Other than what you have alleged in this case --

MR. SINSON: There were -- there were four dash cams at his arrest. And so far we've been shown no video. So other than this case, does he know of any dash cams that weren't activated that should have been? Is that the question?

Q. (By Ms. Reich) Are you aware of any other incidences during the course of a

24

traffic stop where there was a failure to activate a dash cam when required to do so?

A.  Just -- just this time here.

Q.  Okay. No other times; right?

A.  No other times.

[Apollo Dep., at 305-06].  Despite the categorical answer, "no other times" – defense counsel

continued:[6]

Q.  Okay. Are you aware of any other times when, within the Forest Park Police Department, when a  dash cam of no evidentiary value was retained?

A.  What?

Q.  Are you aware --

MR. SINSON: I -- I object to that question.

Q.  (By Ms. Reich) Are you aware of any other instances where dash cam of no evidentiary value was kept?

MR. SINSON: I object to that question.  I don't know what no evidentiary value means. I don't  know what that means.

MS. REICH: Okay.

Q.  (By Ms. Reich) Mr. Apollo --

MR. SINSON: Do you know what that means?  I  have no --

Q.  (By Ms. Reich) Mr. --

A.  I don't know either. What --

Q.  Okay.

---

[6] Perhaps counsel's inquiry was pursuant to Rule 404(b), Federal Rules of Evidence; but it is certainly not clear whether that was the basis. In any event, it seems unnecessary in light of the plaintiff's previous answer "no other times."

A.  I'm waiting for you to --

MR. SINSON: Every dash cam of an arrest has evidentiary value. I don't know what -- I don't know   what you're talking about when you say it has no evidentiary value. It's not -- it's not for the   person that took the dash cam to decide whether it's evidentiary value, it's for the jury to decide. And I'd like to see the four dash cam videos from his February 15, 2018, arrest.

MS. REICH: Thank you for continuing to waste this time.

A.  No, you wasting the time.

Q.  (By Ms. Reich) Mr. Apollo -- Mr. Apollo, are you aware of any other instances where -- are you  aware of any other instances during the course of a traffic stop or arrest where an officer has  intentionally failed to turn on the camera?

A.  No.

MR. SINSON: Other than -- other --

A.  And if they had -- waste of time. If they would have had the tapes, I wouldn't even be sitting  here talking to you all, Gail. That's your -- that's your client's fault. We wouldn't even be going through this if they would have -- if they wouldn't  have destroyed the tapes.

[Apollo Dep., at 306-07].

It is unclear what more information defendants want, or exactly what counsel meant by a videotape of an arrest "having no evidentiary value."  Suffice it to say that, despite the complaints in their motion, defense counsel got her answer early on and again as she continued: plaintiff was not aware of any other times when arrest videotape had been destroyed, and that would include defense counsel's videotapes "of no evidentiary value."  That topic has been sufficiently exhausted and does not warrant granting the defendants' motion.

## CONCLUSION

The conduct of the plaintiff was, at times, provocative and otherwise improper. His frequent reference to defense counsel by her first name was – at best – inappropriate and condescending and should not have been tolerated or allowed by his own lawyer. Defense counsel's restraint was admirable. But, as we observed at the outset, a deposition, at best, is not a garden party. The question is whether the conduct complained of obstructed the deposition so that only a resumption of the questioning could ensure that the complaining party would be able to conduct a deposition consistent with the goal of ensuring an orderly proceeding conducted in a way consistent with the ascertainment of truth. When we consider what occurred in this case, as revealed by the deposition transcript, the delay and obstruction about which defendants are complaining are not significant –  certainly not significant enough to require that the deposition be resumed. It certainly cannot be considered as conduct "that may be characterized as uncivil, abrasive, abusive, hostile, or obstructive and that impedes the fundamental goal of resolving disputes rationally, peacefully and efficiently." *Shabazz v. Arandell Corp.*, 2012 WL 3201884, 7 (E.D.Wis. 2013).  If we add up the digs and jibes employed by the plaintiff, it would not amount to enough to turn the color of legal litmus – certainly not enough to warrant granting the defendants' Motion.  Plaintiff's counsel's objections, similarly, occupied only a few minutes at most. In any event, in nearly all of those instances, plaintiff ended up answering. He said he had a little bit of alcohol the day of his arrest, about a cup.  And he admitted he used heroin and was high the day of his arrest.  He knew of no other times when a videotape was destroyed or missing.

Moreover, as discussed earlier, defense counsel was responsible for some wasted time.  As defendants complain in their Reply Brief, "[t]he deposition of an incarcerated individual takes

considerable planning." [Dkt. #133, at 8]. Even if accurate, the observation has little significance in the present context.[7] The defendants apparently did not inquire as to the type of device plaintiff would be allowed to use. And, despite the fact that the courtroom deputy's number was set forth with unmistakable clarity in four separate Orders of the court, the defendants' lawyer called some number in California with an area code that no one could think was the area code for the courthouse in Chicago. In short, the defendants have not shown the requisite "good cause" to require the deposition to be continued. In fact, they have not even specified how much more time they claim they need, and it is not for me to guess the amount of time the defense feels is necessary and justified in this case. Accordingly, the defendants' motion for additional deposition time [Dkt. #120] is denied.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/14/21

---

[7] It would appear that the real planning is – or certainly should be – in the preparation of the questions to be asked, and that is not a function of whether the deponent is in jail.

28