**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VICTOR APOLLO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 18 C 6475** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **OFFICER ADAM STASINOPOULOS,** | ) | |
| **OFFICER DANIEL MILLER, and** | ) | |
| **OFFICER LAUREN TREVARTHEN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff has filed a motion under Fed.R.Evid. 702 to disqualify defendants' expert on the subject of neuromuscular incapacitation ("NMI"). Judge Gettleman has added that evidentiary motion to his referral of discovery matters to me. [Dkt.# 218]. For the following reasons, the plaintiff's motion [Dkt. #223] is denied.

First things first. Contrary to the title of plaintiff's motion, the defendants aren't offering their expert, Bryan Chiles, as an "expert on the subject of neuromuscular incapacitation." [Dkt.#224-2, Page 2/6]. They are offering him as an expert on Tasers, and in that capacity, courts around the country have allowed and relied on his testimony. *See, e.g., O'Brien v. Murphy*, 2022 WL 4598559, at *4 (E.D. Mo. Sept. 30, 2022); *Taylor v. Moore*, 383 F. Supp. 3d 91, 97 (D. Mass. 2019); *Taylor v. Taser Int'l*, *Inc*., 2019 WL 1434213, at *4 (S.D. Tex. Mar. 29, 2019); *Ramos v. Drews*, 2018 WL 5046087, at *9 (N.D. Ill. Oct. 16, 2018); *Damiani for Est. of Damiani v. Allen*, 2018 WL 4095080, at *12 (S.D. Ind. Aug. 28, 2018); *Cruz v. City of New Rochelle*, 2017 WL 1402122, at *23 (S.D.N.Y. Apr. 3, 2017). The opinions Mr. Chiles does offer here are as follows:

The X2 Energy Weapon X30002PN1:

• Experienced positive (fast) clock drift of 2 minutes and 56 seconds on February 15, 2018.

• Was armed and then powered down via the safety switch with no trigger or arc activity at 15:37:59 CST on February 15, 2018.

• Was not powered on at any time after 12:45 CST on February 16, 2018.

The X26P Energy Weapon X13004YRA:

• Experienced positive (fast) clock drift of 3 minutes and 15 seconds on February 15, 2018.

• Experienced positive (fast) clock drift of 2 seconds on February 16, 2018 after its clock synchronization at 07:49 CST.

• Was trigger activated once on February 15, 2018 at 15:38:35 CST.

• Trigger activation sequence 802 shows the X26P energy weapon discharged into a very high impedance load, typical of a drive stun application for 3.4 seconds, then discharged into a low impedance load typical of open-air discharge (arcing) for 0.5 seconds.

• Was trigger activated 4 times on February 16, 2018 between 19:53 and 19:54 CST.

• Trigger activation sequence 823 shows the X26P energy weapon had an intermittent connection for 6.4 seconds, alternating between a high impedance load typical of discharge through skin and fat and not being able to discharge due to lack of electrical connection.

• Trigger activation sequence 824 shows the X26P energy weapon had an intermittent connection for 1.5 seconds, alternating between a high impedance load typical of discharge through skin and fat and discharging into a low impedance load typical of open-air discharge (arcing).

• Trigger activation sequence 827 shows the X26P energy weapon had an intermittent connection for 5.4 seconds, alternating between a high impedance load typical of discharge through skin and fat and discharging into a low impedance load typical of open-air discharge (arcing).

• Trigger activation sequence 828 shows the X26P energy weapon discharged into a low impedance load typical of discharging (arcing) in open air for 0.9 seconds, then discharged into a high impedance load typical of discharge through skin and fat for 0.2 seconds.

Plaintiff's counsel wisely seems to have no issues with those opinions. His complaint is that Mr. Chiles also offers opinions on whether Officer Miller's Taser usage had the capacity to induce NMI in the plaintiff. Plaintiff's team of lawyers is not specific about exactly what passages they find offensive in a Rule 702 context; they simply cite to 14 pages of Mr. Chiles' report: Exhibit 2, at 7, 11–13, 16–18, 21–27. That is an odd and ineffectual approach. Our adversary system of justice does not require that courts effectively become the advocates of one or the other parties' litigation. Quite the contrary. It is held everywhere that "it is [a]n advocate's job is to make it easy for the court to rule in his client's favor." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006). And it is the advocate's job, not the court's to fashion arguments supportive of a litigant's position. All the courts are unanimous in holding that it is not the court's job to scour the record for evidence to support counsel's motion; to uncover what counsel might think is a medical opinion that it feels has to be stricken. *See Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 510 (7th Cir. 2020)(". . . as we have said on many other occasions, it is not the role of the court to search the record to find support for a party's assertion."); *Hildreth v. Butler*, 960 F.3d 420, 429 (7th Cir. 2020).[1]

[1] Indeed, the Supreme Court recently emphasized, "[i]n our adversarial system of adjudication we follow the principle of party presentation." *United States v. Sineneng-Smith*, ––– U.S. ––––, 140 S.Ct. 1575, 1579, 206 L.Ed.2d 866 (2020). That principle assigns to the court the role of "neutral arbiter of matters the parties present." *Id.* Thus, "as a general rule, [o]ur system is designed around the premise that [parties represented by competent counsel] know what is best for them and are responsible for advancing the facts and arguments entitling them to relief.' " *Id.* at 1579. (Brackets in original).

Judges depend upon input from lawyers. *See, e.g., United States v. Cronic,* 466 U.S. 648, 655, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (" 'Truth' is best discovered by powerful statements on both sides of the question.' "); *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613-614 (7th Cir.2006).

Nevertheless, review of every time Mr. Chiles refers to NMI in his Report does not bring any medical opinions to the court's attention. Mr. Chiles does mention NMI a number of times in his report, but only in the manner a ballistics expert might discuss the effects of different ammunition on the body. For example, the first of the mentions that offends the plaintiff's lawyers comes at page 7. Mr. Chiles is explaining what the weapon is designed to do when fresh cartridges are loaded and the weapon is deployed:

> If both probes contact a conductive target forming a completed (intact) circuit, the electrical charge from the weapon will be delivered through the wires and probes into the target. In human subjects, the delivered electrical charge can cause Neuro Muscular Incapacitation (NMI) when both probes contact the subject in a muscular area with sufficient spread (distance) between the probes. The amount of NMI is generally proportionate to the spread between the probes and varies dependent upon numerous factors, including both probes contacting the subject, the motor-nerves captured in the electric field relative to the probes, amount of muscle between the probes, the amount of skin and fat tissue that the electrical charge has to travel though, and other factors. A wide probe spread to the back capturing large muscle groups can result in full body muscle lockup of a subject. However, if both probes contact the subject, but there is not enough muscle between the probes, the energy weapon will only cause pain and localized NMI of muscle between or close to the probes without full body lockup.
>
> If only one (1) probe makes contact with the subject and the other probe is sufficiently close enough to the subject's skin (within ≈ 1.6 centimeters (cm) to arc to (jump through the air)), with enough spread between the probes, NMI can be achieved by the probe near the skin arcing through the air to the skin. The amount of motor-nerve mediated NMI achieved is again dependent on the amount muscle between the probes, the amount of air, skin, and fat tissue that the electrical charge has to travel through, and other factors.
>
> If only one (1) probe makes contact with the subject, but the other probe is not close enough to the subject's skin to arc to, no NMI will be achieved.

(Chiles Report, at 7). As already noted, plaintiff's counsel directs the court to thirteen other pages in Mr. Chiles' report, but review of those pages reveals passages much like the preceding example. Mr. Chiles explains that "X2 energy weapons are designed to cause NMI when . . . [t]here is a

completed and maintained circuit between the electrodes (or probes) to allow electrical current to flow; [t]here is sufficient spread, or distance, between the electrodes; and [t]here is sufficient motor-nerve mediated muscle mass between the electrodes." (Chiles' Report, at 12). He says that "the effective NMI on an energy weapon deployment varies with associated factors, including the spread between the probes, location of the probes on the subject's body, clothing, movement, and environmental factors." (Chiles' Report, at 12). Mr. Chiles offers similar commentary at pages 17 ("TASER energy weapons are designed to cause Neuromuscular Incapacitation (NMI) when certain conditions are met . . . ."); 18 ("The effectiveness of an energy weapon to cause NMI is not always either 100% or 0%. Depending upon, among other factors, the spread between the probes, location of the probes on the subject's body, clothing, movement, environmental factors, assuming there is a completed circuit, the effective NMI on an energy weapon deployment varies with the associated factors. . . ."); 22 (". . . The brief connection was then lost and the X26P discharged into a very low impedance load, typical of arcing in open air (i.e., in front of the cartridge) for the remaining 0.5 seconds. This activation would not have had potential for effective NMI. . . ."); 23 ("The X26P had an intermittent connection, alternating between discharging into a very high impedance load, typical of discharging through skin and fat or arcing a long distance, and having no connection and not being able to discharge. This activation would not have had potential for effective NMI due to the lack of consistent connection. . . . ."); and so on. Again, these are not medical opinions. Mr. Chiles is explaining what a Taser is designed to do and what conditions are necessary for the device to do that effectively.

This all seems obvious, but this case is now in its fifth year during which there have been three and a half years of discovery [Dkt. #26], proving once again the insight of Judge Posner's observation that "protracted discovery, [is] the bane of modern litigation." *Rossetto v. Pabst Brewing Co., Inc.,* 217 F.3d 539, 542 (7th Cir.2000). The case has been heavily, if not overly, litigated, with discovery disputes being brought to court on a regular basis [Dkt. ##26, 37, 39, 41, 59, 66, 79, 82, 87, 90, 109, 120, 185, 194, 204, 217, 223], so perhaps a motion such as this should come as no surprise. Years of discovery tend to result in scorched earth tactics from the lawyers. What might come as a surprise – to the Seventh Circuit as well – is plaintiff's counsel stance that the foregoing types of opinions could only be rendered by a physician. The Seventh Circuit, itself, offered a similar Taser tutorial in *Dockery v. Blackburn*, 911 F.3d 458 (7th Cir. 2018):

> To understand what happened next requires some background on Sergeant Blackburn's Taser x26 model. The Taser x26 has three modes. "Probe mode" or "dart mode" is used when an officer fires a Taser at a distance. The Taser shoots two metal prongs that attach to the subject's body. An electric current flows between the prongs, causing momentary neuromuscular incapacitation by rapidly contracting the subject's muscles. Each trigger pull produces five seconds of 5,000-volt electrical pulses with 19 pulses per second. Both prongs must attach to the subject to cause incapacitation.
>
> Next, an officer may use "three-point" mode when only one working prong is attached to the subject. This often occurs when the other prong misses the target, is damaged, or is pulled out by the subject. To complete the electrical circuit with the attached prong, the officer presses the nose of the Taser directly on the subject's body. Three-point mode thereby produces neuromuscular incapacitation in the same manner as probe mode.
>
> Finally, an officer may use the Taser x26 in "drive-stun" mode. This mode does not require a probe to be attached to the subject. The officer presses the nose of the Taser directly on the subject's body and electricity flows between two electrodes on the end of the device. Unlike the other modes, drive-stun mode does not work by way of neuromuscular incapacitation. The officer instead uses drive-stun mode for "pain compliance," which induces a subject to submit to an officer's directions. When the officers arrived at the station with Dockery, they led him through the adult booking room and then through an open door into the adjacent juvenile booking room.

> Security-camera footage from each booking room is in the record. Sergeant Blackburn's Taser also had a built-in video camera that automatically started recording within 1.5 seconds of deployment. The Taser recorded black-and-white footage and audio of the incident.

911 F.3d at 462.

There is not so much as a hint that the Seventh Circuit relied on a doctor to explain how a Taser works. (Or needed to). In other words, these types of explanations are not medical opinions.

The same goes for Mr. Chiles' deposition testimony. Mr. Chiles testified, along the lines of his report and the Seventh Circuit's explanation in *Dockery*, that certain data showed a lack of connection in terms of electrical current meaning the Taser could not induce NMI effectively. (Chiles Deposition at 92-93). As Mr. Chiles said in his report:

> If both probes contact a conductive target forming a completed (intact) circuit, the electrical charge from the weapon will be delivered through the wires and probes into the target. In human subjects, the delivered electrical charge can cause Neuro Muscular Incapacitation (NMI) when both probes contact the subject in a muscular area with sufficient spread (distance) between the probes.

Similarly, in *Dockery*, the court explained that "[t]he Taser shoots two metal prongs that attach to the subject's body. An electric current flows between the prongs, causing momentary neuromuscular incapacitation by rapidly contracting the subject's muscles." For some reason, plaintiff complains that Mr. Chiles ought to have been testifying how the human body reacts to electric shocks instead of about electrical conductivity. [Dkt. #224, at 6-7]. But that, it would seem, actually *would be* the province of a doctor.

Now, there is no way to predict what might develop in terms of testimony if this case ever gets to trial. Perhaps Mr. Chiles might stray into what could honestly be regarded as medical territory. But that's why the trial judge is tasked with the "gatekeeper" role of screening expert witness evidence. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). At that time, if testimony

strays from an expert's area of expertise, proper objections should garner appropriate rulings from the trial judge. And, as always, vigorous cross-examination remains the appropriate tool for attacking questionable testimony. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 596 (1993). But, again, we don't know what testimony might come up at a trial.

As such, and based on my review of Mr. Chiles' report and the snippets of his deposition testimony plaintiff has provided, I cannot disqualify him as an expert on the basis set forth in plaintiff's motion. Judge Gettleman may have a completely different idea if and when he has a trial in this case or considers dispositive motions. Evidentiary rulings like those under Fed.R.Evid. 702 are matters of discretion. *United States v. Tsarnaev*, – U.S. –, –, 142 S.Ct. 1024, 1040 n.3 (Mar. 4, 2022); *Joiner*, 522 U.S. at 141–42 (1997); *United States v. Cox*, 54 F.4th 502 (7th Cir. 2022). Being a range, not a point, discretion allows two decision-makers – on virtually identical facts – to arrive at opposite conclusions, both of which constitute appropriate exercises of discretion. *Compare United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) with *United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996). *See also Mejia v. Cook Cty., Ill*., 650 F.3d 631, 635 (7th Cir. 2011)("it is possible for two judges, confronted with the identical record, to come to opposite conclusions and for the appellate court to affirm both."); *United States v. Bullion*, 466 F.3d 574, 577 (7th Cir. 2006)("The striking of a balance of uncertainties can rarely be deemed unreasonable....").[2]

---

[2]While judges rarely farm out evidentiary rulings like this one, *see* N.D.Ill. I.O.P. 14, the same instincts apply here as apply when judges – quite routinely – farm out discovery matters. The tendency is to err on the side of more rather than less. Why knock out an entire line of expert evidence that the trial judge might have wanted left in? See Frank H. Easterbrook, Discovery As Abuse, 69 B.U.L. Rev. 635, 639 (1989)("One common form of unnecessary discovery (and therefore a ready source of threatened discovery) is delving into ten issues when one will be dispositive. A magistrate judge lacks the authority to carve off the nine unnecessary issues; for all the magistrate judge knows, the district judge may want evidence on any one of them. So the magistrate judge stands back and lets the parties have at it. Pursuit of factual and legal issues that will not matter to the outcome of the case is a source of enormous unnecessary costs, yet it is one hard to conquer in a system of notice pleading and even harder to limit when an officer lacking the power to decide the case supervises discovery."). As explained above, the opportunity remains for Judge Gettleman to hem

Accordingly, the plaintiff's motion [Dkt. #223] is denied.

**ENTERED:**______________________________
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 1/27/23

in any testimony that might wander into an area best left to physicians.